I'd like to save my time for rebuttal. May it please the Court, I am Raj Abhiyanka, representing the appellant, LegalForce RAPC Worldwide, PC. This case is about deliberate deception, how the appellee, LegalForce Japan, knowingly used our LegalForce trademark to solicit millions from American venture capital investors, creating confusion and damaging our goodwill in the U.S. market. When we filed our initial complaint in June 2022... So is your argument based on the premise that equity is a good or a service, or is it that the sales or the equity activities were in connection with something else that is as good as that? I want to make sure I understand what your theories are on that point. Yeah, so our theories are rested in Riordan LLC v. Riordan Commerce, Inc., and our primary theory is that that case is a Ninth Circuit case. It addresses the issue of trademark infringement based upon confusion among non-consumers. The Court identified three types of confusion which apply here. These three confusion types are potential customers, individuals who may not have purchased but yet could be confused by the similar trademark. What's the good or service at issue here? The good or service that is at issue here is an intangible sale of equity. There is no physical good. Your theory is that equity is the good or service, and that triggers the Lanham Act. It's not that the sale of equity is in connection with some other good. Right. The equity itself is the... Equity itself. Okay. So how would you define goods or services under the Lanham Act? So we would define anything that creates consumer confusion that affects the goodwill. Doesn't that conflate the two parts of it? You've got to have it has to be in connection with goods or service, and then you have to show likelihood of confusion. But in reading your brief, it seems to just focus on likelihood of confusion, untethered to goods or services. Right. Well, the intangible assets of goodwill affects valuation and is a brand equity in itself. So if you think about goods or services in a literal sense, in today's world, much of what we call goods or services are not actually tangible. They're websites. They're things that we can't see or touch. In this case, if you look at most companies, when they have a valuation done in their company, whether private or public, a substantial portion of its assets, whether it's Coca-Cola, Tesla, or anyone else, is the goodwill it carries. So in this particular case, we have alleged, we have basically clarified that goodwill is a key part of trademark because the purpose of trademark is to serve as a source identifier. And in Horfag Research v. Pellegrini, this Ninth Circuit held that trademark law protects goodwill associated with a brand and that goodwill is an important asset for trademark holders, independent of a physical good or service. And the owner of that, you know, we believe, the Court emphasized in that case, that it's not about just protecting consumers from confusion for goods and services, but allowing trademark holders to capitalize on the goodwill they have built over time. We've invested in our company millions of dollars in this brand. And the idea that the confusion, even though indirectly affected non-consumers, which were the American venture capitalists, affects the end potential customers that we have because they may think we're in a different market than we actually are, that we are producing goods that are different than ours. Our goodwill gets tied to a startup, which is not yet profitable where we are. So we believe that goods and services are not necessarily, as in the traditional sense, the physical items or the services provided by humans, but they're the actual intangible equities that could also constitute goodwill. It could affect interstate commerce because they affect goodwill. And the sale of those securities impact that. What case supports this new theory of goods and services? What was that? What case do you have that most best supports this theory? So in Horfag Research Ltd. v. Pellegrini, it's a 2003 case. The Ninth Circuit held that trademark law protects goodwill associated with brands and that goodwill is an important asset for trademark holders. So our case revolves around the impact of goodwill. But do you have a case that says that equity is a good or service? No, we don't. For the purposes of the landmark. No, Your Honor. There are some district court cases that say it's not. But are there any cases that say that it is? No. The district court cases, Cottonwood and International Olympic Commission, are Texas cases. They are not holding law. And they can be distinguished for a number of reasons. Neither of the prior cases dealt indirectly, but with a highly impactful type of confusion that affects Toyota Total's goodwills or through their actions. Here we have alleged bad faith. They not only used this trademark that was the same exact name as ours, they used it in an orange color and their own trade practices to solicit venture capital funds with an American flag next to it. And we believe that that conduct, it constitutes a bad faith infringement that helped ultimately that company raise over $100 million in capital. So those cases which are not in this district and are also not holding law, they're in Texas district court, shouldn't apply here. Thank you. So I'll continue forward with my arguments. So what's more is this LegalForce advertisements to American investors during the summer of 2022, as I mentioned, used our distinctive orange color theme. They presented a counterfeit LegalForce mark directly next to an American flag, further reinforcing a false connection with our company LegalForce RAPC. The orange color backgrounds has the words translated roughly to powerful enterprises not here. It admits their knowledge of our rights and reveals a clear attempt to ride on the brand equity we've built in the U.S., spending millions of dollars to build that brand. And through that deception, they successfully raised over $100 million. And, Your Honors, trademark infringement is not always black or white. It's more than just names and logos and goods and services in their traditional sense. It's about the positive associations, the warm and fuzzy feelings that a brand that like LegalForce builds over time. We've invested significant resources in developing this brand into a trusted name for IP and trademark registration and legal services. And these very associations are what LegalForce Japan is now trying to undermine and is undermined. Even if American venture capitals weren't directly confused, they almost subconsciously were influenced by the similarity. Our brand equity built over more than a decade of hard work was leveraged to sway investment decisions. And beyond the investors, those who saw press coverage of LegalForce Japan's fundraising efforts likely believed that LegalForce RAPC had shifted focus, perhaps leading them to think that business had become something different. And this is the exact type of confusion and harm that trademark law seeks to prevent. And that's why we believe LegalForce Japan's actions constitute clear trademark infringement. We would like to also give you an example. Like, if you look at Netflix today, imagine a foreign company like Netflix and with a similar branding raise funds from American investors. After being sued by the real Netflix, the startup rebrands and keeps the funds it's raised under false association. And in the future, this may not just be institutional investors, it could be individuals, accredited investors, crowdsourced investors. And allowing them to avoid liability by simply changing the name months after, and mind you, they didn't change the name in this case until two months after this lawsuit was filed, would be unjust. Investors have subconsciously believed that they're investing in a trusted Netflix brand in that example. And this confusion would harm the goodwill of Netflix and the market value. So setting a precedent here is very important, not just for this case, but the future. And this highlights how exploiting a well-known brand, a suggestive trademark, can mislead investors in the future and damage the rightful goodwill of a trademark owner's reputation. So with that, I'd like to reserve any balance time I have. All right. Thank you, counsel. May it please the court, my name is David Mackman. I'm here on behalf of Legal On Technologies Inc., formerly known as Legal Force Inc. Now I say Inc., but this is actually a translation. These are Kabushiki Geisha. Legal On Technologies Inc. is a Kabushiki Geisha. It is a Japanese company located in Japan, and it sold its Japanese shares. I'd like to start by talking about the things that were not appealed, because there are several issues that were not raised in the appeal that are res judicata and that, in my view, strongly affect this appeal and are, in fact, dispositive. The court made two rulings that are not appealed. The first is a jurisdictional ruling. It ruled that it did not have jurisdiction over my client's sale of software using the Legal Force brand in Japan. My client has the right, it has the registered trademark for Legal Force in Japan, so it has every right to sell its software there. The plaintiff did not establish that those sales were purposely directed at the United States. So the only goods and services that are at issue in this case were sold in Japan as a matter of law res judicata and therefore are not at issue. The one thing that the court did take jurisdiction over is the claim that by advertising shares in the United States, there was trademark infringement. The sale actually took place in Japan. Shares are — they're Japanese shares. They can't leave Japan. They're an intangible, non-corporeal thing. They're subject to the Japanese courts. The other ruling that the court made that was not appealed is the ruling that plaintiff, in his second amending complaint, had not established that any facts sufficient to grant extraterritorial application of the Lanham Act. And that's based on the Love decision from this court, the Beach Boys case. I wish they all could be California torts, was the quote in that case. But the court there found that there was no extraterritorial jurisdiction because there was no monetary injury in the United States. I raised this in my opposition. And on reply, what plaintiffs said in his papers was that he's looking for three kinds of damages, attorney fees, statutory damages, and disgorgement. All three of those damages are based entirely on the Lanham Act. If the Lanham Act doesn't have extraterritorial application, which it doesn't, according to the Abitron case from the Supreme Court, and which is not appealed and is res adjudicata here, then none of the relief the plaintiff is seeking is available here regardless of the question of shares being goods or services. How is it an extraterritorial application if money is raised using the mark in terms of equity in the United States? The money isn't raised in the United States. The stocks were sold in Japan. The money is held in bank accounts in Japan. The disgorgement would require an order forcing my client to disgorge from their accounts in Japan. And it's the money — No American investors were involved in the money that was raised? These are international investors. All of the transactions commenced in Japan. I mean, that's an issue of fact, obviously, but all the transactions commenced in Japan and were closed in Japan. There's a very small amount of activity in the United States. So the money is in Japan, the shares are Japanese shares, and the agreements are going to be subject to Japanese law, not U.S. law. And it's securities law, not the law of goods and services, because shares are not a good or services. The Avatron case says that you look at the focus of the statute and the conduct that is described therein. That's the use in commerce of the mark in connection with goods and services. The goods and services here are software. That conduct occurred in Japan. So it would additionally require under the Supreme Court's Avatron case, the one that says U.S. law does not rule the world, and talks about international comedy and respect for foreign sovereignty. That case says that the Lanham Act doesn't have extraterritorial effect. And in particular, if the focus of the statute, the use in commerce on goods and service, occurred outside the United States, then there's no relief in United States courts. Now, if we move on to the merits of his claim that somehow the advertisement of shares in the United States is trademark infringement, we run into problems immediately. The Lanham Act is what governs trademark infringement. It has elements. Like every cause of action in federal court, it has elements, and those elements include use in commerce on goods and services. The only case, and so you can't just read that out of the statute, goodwill is important to trademark analysis, but it's not an element of trademark infringement. So he has problems with the statute. He didn't have any cases supporting his position when he filed the case or at the hearing on the motion to dismiss, or even on his appeal. It's a novel theory that's not supported by the case law or the plain language of the statute and has no merit. He's referred to a case called the Reardon case. In that case, the court did remand, but there was finding that there was some evidence of consumer confusion and that the non-consumer confusion, therefore, could be relevant to evaluating likelihood of confusion. The non-consumer confusion is not trademark infringement in itself when it's not tied to actual use with goods and services and to actual consumers. The Reardon case, in addition to having elements, trademark law has a sine qua non, and the sine qua non is consumer confusion. That's an essential element of any claim of trademark infringement, and here the consumers, the people buying goods and services, are in Japan. The investors are not consumers. They're investors, and there's no evidence of confusion among the investors. You wouldn't spend and buy that way. I believe the investment was denominated in yen, not dollars, and so the value will be fluctuating with currency, but you wouldn't put that kind of money into a company without investigating the management team and knowing who you're investing in, what the business plan is, and vetting things such that you're not going to be confused as to where the money is going. Thank you. And you indicated that if I didn't have a lot more to say, I could sit down, so unless you have any questions, I will sit down. Thank you, counsel. Yes, you have a minute. Yeah, so to address a few things, they did a road show in the U.S. and they sold shares in the U.S., including right here in Silicon Valley. World Innovation Labs is located in Palo Alto. Sequoia Capital is in Palo Alto. Goldman Sachs is here. They had multiple trips to the U.S. They hired a U.S. CEO. And moreover, sale of goods and services includes the sale of legal services. We sell legal services, which are intangible, and that is defined under the Trademark Act, and the USPTO rules as a classification of a trademark, which we have. And the sale of equities for a business like ours, which raises money as well at the same time in the same kind of competitive space of Internet legal services in a broad sense, can create a confusion with our legal service, which is a service under the Trademark Act. So those are the main things that I wanted to say. All right. Thank you very much, counsel. Legal Force RAPC versus Legal Force Inc. is submitted. We'll take a break.
judges: THOMAS, WARDLAW, COLLINS